Estate of John E. SCHOFFMAN,
Appellant,

v.

CENTRAL STATES DIVERSIFIED, INC.,
a Missouri corporation; J. Russell Flowers; Ronald S. Prince; and Charles F. Aebel, Appellees.

Michael KECKEISEN, Appellant,

v.

CENTRAL STATES DIVERSIFIED,
INC., a Missouri corporation; and J. Russell Flowers, Appellees.

Nos. 94–2555 & 94–3222.

United States Court of Appeals,
Eighth Circuit.

Submitted May 18, 1995.

Decided Oct. 26, 1995.

Donald H. Nichols, Minneapolis, MN, argued (Curtis D. Brown, on the brief), for appellant.

W. Stanley Walch, St. Louis, MO, argued (John J. Carey, St. Louis, MO and David G. Newhall, Minneapolis, MN, on the brief), for appellee.

Before: ARNOLD, Chief Judge, and WOOD, Jr.,* and FAGG, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge:

In this consolidated action, John E. Schoffman's Estate ("Schoffman") and Michael Keckeisen appeal the district courts' decisions to grant summary judgment in favor of the defendants below—Central States Diversified, Incorporated ("Central States"); J. Russell Flowers; Ronald S. Prince; and Charles F. Aebel.[1] In their suits, Schoffman and Keckeisen primarily argued that a letter, written by Aebel on October 6, 1988, entitled them to a portion of the equity appreciation realized by West Pac, a division of Central States. The district courts granted the defendants' motions for summary judgment after concluding that the October 6 letter was too vague to constitute an enforceable contract. For the reasons given below, we affirm the decisions of the district courts.

## I.  BACKGROUND

This dispute arose from negotiations which were conducted regarding the creation of the

---

* The Honorable Harlington Wood, Jr., United States Circuit Judge for the Seventh Circuit Court of Appeals, sitting by designation.

1. Prince and Aebel were named as defendants in Schoffman's suit, but not in Keckeisen's suit.

West Pac division of Central States. Central States, a manufacturer of specialty packaging and medical products, entered into these negotiations with Richard J. Wesley, who eventually became West Pac's first president. Wesley had formerly owned and operated the Color–Ad Packaging Company ("Color–Ad"), which produced the same type of specialty packaging materials that West Pac would later manufacture.

■ Schoffman and Keckeisen's relationship with Wesley stems from Wesley's employment of them at Color–Ad. Although they had continued to work for Color–Ad after Wesley sold the company to American National Can,[2] Schoffman and Keckeisen were interested in following Wesley to West Pac. Accordingly, Wesley's negotiations with Central States touched upon the possible roles of Schoffman and Keckeisen in that venture. Schoffman and Keckeisen did not, however, directly participate in these negotiations.[3]

On October 6, 1988, Charles F. Aebel, the Executive Vice President and Chief Financial Officer of Central States, wrote a letter to Wesley addressing the current status of their negotiations. This letter reads:

> This letter will confirm our agreement with regard to the development of a new company, as we have discussed, to expand [Central States]. While the exact organizational structure and many other aspects of this venture have not been specified, we do have agreement on the following:
>
> 1. The new venture will employ you on January 1, 1989. It will be your responsibility as President of the new venture to hire a management team, select and procure a plant location, equip it and bring the venture to profitable operation. You will report to Mr. Ron S. Prince, the President of [Central States], and, as you have seen to date, Mr. Flowers[4] and others in the [Central States] management team will work closely with you to accomplish our mutual objectives.
>
> 2. We have discussed your compensation as well as that of the management team you will attempt to assemble. Those compensation levels are set forth in Exhibit I to this letter.[5]
>
> 3. We have discussed various fringe benefits. In general, we would like to keep these in line with the items currently offered by [Central States].... Specific establishment of benefits shall be subject to Mr. Prince's approval.
>
> 4. The capital necessary to start this new venture will come from Mr. Flowers and/or [Central States]. Accordingly, Mr. Flowers will own 100% of the venture directly or indirectly. We have agreed, however, to set aside 33⅓% of the equity appreciation in the new venture as an incentive compensation program for 6 key executives of the new venture, plus Mr. Prince (7 people in total). We envision this to take the form of a phantom stock plan. While a formal plan must be adopted, we have agreement on the following points:
>
>   a. Each of the seven people will share equally in the equity appreciation pool.
>
>   b. The vesting period will be 4 years, or 25% per year.
>
>   c. An equity pool will not be available for distribution to participants unless and until Mr. Flowers first receives a return of his investment, either through earnings of the venture or through gain on its sale.
>
>   d. Certain events could trigger the distribution of equity to participants.

2. Wesley, too, continued to work at Color–Ad in a managerial capacity after selling the enterprise to American National Can.

3. We note that Minnesota has recognized the enforceability of third party beneficiary rights if recognition of such "rights is 'appropriate' and either the duty owed or the intent to benefit test is met." *Cretex Cos. v. Construction Leaders, Inc.,* 342 N.W.2d 135, 139 (Minn.1984) (emphasis omitted) (citing Restatement (Second) of Contracts § 302 (1979)).

4. J. Russell Flowers is the sole stockholder, Chairman, and Chief Executive Officer of Central States.

5. The handwritten Exhibit I to the October 6 letter listed compensation levels for the following individuals: president ($181,000), chief financial officer ($110,000), vice president-sales ($100,-000), technical director ($70,000), and two salesmen ($66,000).

These include a public offering, a sale of the company, the termination of an employee who has a vested equity appreciation or death or total disability of the participant.

  e. The plan will include a clause which denies a participant his vested equity appreciation if he leaves the new venture to work for a competitor.

If you accept this new challenge and you agree with items set forth herein, please so indicate in the space provided below.[6]

Even though there is much more to be discussed and agreed, we look forward to a long and mutually rewarding association.

Wesley's negotiations with Central States continued, and he was eventually hired as the president of West Pac in April, 1989—four months later, and at a salary of $31,000 less, than was detailed in the October 6, 1988 letter.

On July 21, 1989, Aebel sent another letter to Wesley which "identif[ied] the seven employees referred to in my letter to you of October 6, 1988." Schoffman and Keckeisen were among those employees identified. Schoffman was then hired by West Pac to serve as its Chief Financial Officer on July 26, 1989,[7] and Keckeisen was hired in Au-

gust, 1989, to serve as its Technical Director. Due to an alleged personality problem, Keckeisen was subsequently fired by West Pac in August, 1991. Citing deficiencies in his performance, Central States fired Schoffman one month later.

On September 17, 1992, Schoffman filed suit against Central States, Flowers, Prince, and Aebel in state court. Primarily basing his suit on the October 6, 1988 letter, Schoffman alleged that Central States was obliged to grant him a share of West Pac's equity appreciation. Schoffman died less than a week thereafter, and his estate was substituted as the plaintiff. Central States subsequently removed the action to federal court. Keckeisen filed a substantially similar suit[8] against Central States and Flowers—before a different district court judge[9]—on August 2, 1993.

The parties to Schoffman's action then filed competing motions for summary judgment, and a hearing was held. On March 18, 1994, the district court granted the defendants' motion for summary judgment, and denied Schoffman's motion, after concluding that the October 6, 1988 letter was too vague to constitute a valid contract. *Estate of John Schoffman v. Central States Diversified,*

---

**6.** Wesley signed and dated the letter under a heading which read "Acknowledged & Agreed," and then returned it to Aebel with a cover letter that addressed "a few issues which need more definition, and a more complete understanding on our part."

These issues were as follows: (1) Wesley was unhappy with the length of the vesting period (four years) in light of his age and health considerations; (2) Although he did not mind reporting to Prince, Wesley wished to be allowed to keep certain of his previous management systems intact; (3) Wesley desired more information about Central States's benefit package in general, and a better definition of the company car program in particular; (4) Wesley sought to delay, by at least two weeks, the starting date of his employment at West Pac so that he might participate in the profit sharing plan operated by his then current employer, American National Can; (5) Wesley stated that he would like Central States to draft one-year employment contracts for key employees; and (6) Wesley stated that "[a]ll of us would very much appreciate having the final document in place prior to my resignation." After listing these items, Wesley "conditionally sign[ed] the Agreement."

**7.** Once he began working for West Pac, Wesley quickly encountered difficulties due to a non-competition contract that he had signed with American National Can, the entity that had purchased Color–Ad. American National Can eventually filed suit and Central States was forced to terminate Wesley. Schoffman then replaced him as acting president. Wesley subsequently died in July, 1991.

**8.** More particularly, Keckeisen's complaint alleged five causes of action: (1) breach of contract; (2) promissory estoppel; (3) breach of the implied covenant of good faith and fair dealing; (4) tortious interference with contract; and (5) negligence. Schoffman's complaint alleged: (1) breach of contract; (2) promissory estoppel; (3) breach of the implied covenant of good faith and fair dealing; (4) tortious interference with contract; and (5) fraud. In addition, Schoffman's complaint initially contained a state law-based claim of age discrimination, but the parties later stipulated to its dismissal from Schoffman's complaint.

**9.** Then Chief Judge Diana E. Murphy presided over Schoffman's action; Judge David S. Doty presided over Keckeisen's action.

*Inc.,* Civ. No. 4–92–939, 1994 WL 869832 (D.Minn. Mar. 18, 1994). Central States consequently filed a motion for summary judgment in Keckeisen's action. The district court granted this motion after conducting an independent review and likewise concluding that the October 6, 1988 letter was not an enforceable contract. *Keckeisen v. Central States Diversified, Inc.,* Civ. No. 4–93–727, 1994 WL 869838 (D.Minn. Aug. 16, 1994).

Schoffman and Keckeisen now appeal their respective judgments. In light of their common issues of law and fact, the appeals have been consolidated by agreement of the parties.

## II. STANDARD OF REVIEW

■ We review a grant of summary judgment by considering all factual issues in the light most favorable to the nonmoving party (herein Schoffman and Keckeisen) and determining *de novo* whether there exists any genuine issue of material fact requiring submission of the case to the finder of fact or whether judgment as a matter of law was appropriate. Fed.R.Civ.P. 56(c); *Layton v. United States,* 984 F.2d 1496, 1499 (8th Cir.) (citations omitted), *cert. denied,* — U.S. ——, 114 S.Ct. 213, 126 L.Ed.2d 170 (1993).

10. Before answering this question, however, we must determine which state's laws to apply. Jurisdiction over this matter is founded in diversity, 28 U.S.C. § 1332, and since the district court below was located in Minnesota, we look to that state's choice of law rules to determine which body of substantive law to apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Birnstill v. Home Sav. of Am.,* 907 F.2d 795, 797 (8th Cir.1990).

First propounded by Professor Leflar, the "better-law" approach, as it is commonly known, was adopted by Minnesota in *Milkovich v. Saari,* 295 Minn. 155, 203 N.W.2d 408 (1973). This analytic methodology looks to five factors in order to determine the governing law: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. *E.g., Myers v. Government Employees Ins. Co.,* 302 Minn. 359, 365, 225 N.W.2d 238, 242 (1974).

Assuming that we are not faced here with a "false conflict," we conclude that the law of Minnesota governs the validity of this putative contract. The first consideration of the better-law analysis, predictability of results, is dispositive here. Predictability of results is of great

## III. DISCUSSION

### A.

■ The primary question before us is whether the October 6, 1988 letter requires Central States to grant a share of West Pac's equity appreciation to Schoffman and Keckeisen.[10] Having examined the language of this letter, we find that the legal conclusions of the district courts below should be upheld; the equity appreciation provisions of the October 6 letter are too vague to be enforceable.

The October 6, 1988 letter states that the equity pool will not be available for distribution to the venture's key executives until after Flowers "receives a return of his investment ... through earnings of the venture."[11] We first find that this language is unclear concerning the commencement of deposits into the equity pool. The language may mean that Flowers must completely recoup his investment before a share of the venture's equity appreciation begins to accrue in the equity pool; alternatively, it may mean that the pool's share of the equity

importance in the contractual field and, here, both parties have freely assumed that Minnesota law governs the validity of their contractual relations. The parties each mention the possible application of Missouri law only briefly, in footnotes. *More than the parties' consent is required at this stage, however:* Due process requires that a matter have sufficient contacts with a state in order for that state's laws to be applied. *E.g., Clay v. Sun Ins. Office, Ltd.,* 377 U.S. 179, 181–82, 84 S.Ct. 1197, 1198–99, 12 L.Ed.2d 229 (1964).

In this case, it is true that Aebel drafted the "offer" in Missouri, but Wesley did acknowledge his qualified consent in Minnesota. Moreover, West Pac—the establishment of which was the subject of the letter—is located in Minnesota. Minnesota thus has a strong connection to the West Pac undertaking. This fact, coupled with the parties' undisputed expectation that Minnesota law would govern the matter, is sufficient to support our finding that the law of Minnesota is dispositive.

11. The letter also states that the equity pool will be available for distribution if Flowers receives a return of his investment through gain on the sale of West Pac, but as this has not occurred, we may focus our analysis on the "earnings of the venture" language.

appreciation accrues immediately and is simply not available for distribution until after Flowers has recouped his entire investment.

More worrisome, the letter fails to define the phrase "earnings of the venture."[12] The appellants are simply incorrect when they argue that this indefiniteness is analogous to an indefinite price term. It is true that a sales contract's failure to list a price is not a fatal omission as it is implied that the parties intended the price to be a reasonable one. Minn.Stat. § 336.2–305(1) (1995). However, there is no objectively preferable method of calculating West Pac's earnings, and a quick review of the various methods reveals that they may impact the computation of the venture's equity appreciation in very different ways. These methods would therefore prove more or less advantageous to the key executives participating in the equity appreciation program. The choice among these methods is particularly ill-suited to an objective determination because it hinges entirely upon the bargaining process. We believe that, as of the drafting of the October 6, 1988 letter, this process had not yet seriously begun.

Indeed, the letter itself acknowledges its limited role in the formation of an equity appreciation program. The letter states that "a formal plan *must* be adopted" (emphasis added).[13] Furthermore, the letter merely "envision[s]" the formation of an equity appreciation plan, one taking "the form of a phantom stock plan." The last sentence of the letter, in fact, is quite clear: "[T]here is much more to be discussed and agreed. . . ." The contractual language at issue in the *Wilson* and *Hartung* cases, relied upon so heavily by the appellants, lacks such telling disclaimers. *Wilson v. Duluth Filter Co.,* 311 Minn. 475, 250 N.W.2d 832 (1977); *Hartung v. Billmeier,* 243 Minn. 148, 66 N.W.2d 784 (1954).

Wesley's reply to the October 6 letter casts further doubt on the definiteness and finality of that letter's terms: Wesley's October 17, 1988 response expressly "condition[s]" his acceptance upon future negotiations regarding, *inter alia,* the length of the vesting period, the provision of one-year employment contracts for key people, and the drafting of "the final document" between the parties.

---

**12.** In their brief before this court, the appellees included a partial list of the possible methods that could have been, but were not, adopted: (1) increase in net book values based on financial statements prepared in accordance with generally accepted accounting principles; (2) increase in net book value, adjusted by such possible variables as (a) depreciation, (b) market value of liquid assets, (c) dividends, (d) interest rates, and (e) taxes; (3) operating income—either before or after—taxes, interest, and depreciation; (4) operating income as adjusted for certain nonoperating items, such as corporate overhead, debt, return on investment, and taxes; (5) excess of the venture's future sales proceeds over either the absolute or depreciated costs incurred; (6) excess of appraised values over either absolute or depreciated cost at stated points in time; or (7) any of the methods listed above could have been further adjusted for changes in inflation or deflation as measured by a selected index, such as the consumer price index.

**13.** True to the letter's word, Central States did later adopt a deferred compensation plan based on the letter's general terms. This formal plan was adopted by Central States's board of directors in September 1992, and made retroactive to January 1, 1989—the approximate date that West Pac commenced operations. Central States did not name Schoffman and Keckeisen in this plan, however, since (1) their employment with West Pac had already been terminated by this time; and (2) West Pac had failed to make a profit by the time of their terminations.

The equity appreciation plan awards each participant a pro rata share of the value of West Pac's equity appreciation pool. Central States alleges that West Pac had lost approximately $8,000,000 at the time that the formal plan was adopted. To determine West Pac's equity appreciation (or depreciation) from this point on, the plan begins with West Pac's net operating income or loss for the year. Then, back interest payments on West Pac's debt (which includes both bank loans and advances from Central States) are subtracted from this figure along with West Pac's share of Central States's corporate overhead expenses and income taxes.

If, in a given year, West Pac experiences an equity depreciation, or if no change is realized, the participants in the plan do not receive anything and the depreciation is simply added to the $8,000,000 already suffered. If, however, West Pac does experience an equity appreciation, this increase goes first towards reducing the total losses already suffered by West Pac. Once the equity appreciation pool has inched into the black, then the participants in the plan are entitled to their vested shares of this amount, to be paid upon the occurrence of one of the triggering events detailed in the October 6, 1988 letter.

Although it may be true that " 'any offer or agreement is indefinite and uncertain in some degree since words are but imperfect symbols of what each party understands and intends,' " we conclude that this putative contract's vagueness is more than " 'subtle.' " *Wilson,* 311 Minn. at 479, 250 N.W.2d at 835 (quoting *Hartung,* 243 Minn. at 150–51, 66 N.W.2d at 787–88 (footnote omitted)). By this decision, we do not " 'destroy the intent of the parties' " since we are unable to " 'reasonably find that intent by applying the words used, with all their reasonable implications, to the subject matter as the parties themselves, under all the surrounding circumstances, must have applied, used, and understood them.' " *Id.* at 479–80, 250 N.W.2d at 835 (quoting *Hartung,* 243 Minn. at 151, 66 N.W.2d at 788). The vagueness of the letter on the subject of the equity appreciation program is pervasive—we cannot satisfactorily determine what the parties intended the operative language of the October 6 letter to mean; we cannot even be certain that the parties intended for the October 6 letter to be binding at all on this subject.

■ Although the courts of Minnesota generally disfavor this result, *e.g., Hill v. Okay Constr. Co.,* 312 Minn. 324, 333, 252 N.W.2d 107, 114 (1977) (citations omitted), we are compelled here to affirm the district courts' findings that the October 6 letter is too vague to constitute an enforceable contract. We believe that the letter represents, at best, no more than a summary of the course of negotiations, and an expression of willingness to later enter into a binding agreement regarding the sharing of the venture's equity appreciation. *See Hansen v. Phillips Beverage Co.,* 487 N.W.2d 925, 927 (Minn.Ct.App.1992) ("This letter creates merely an agreement to negotiate in good faith. Under Minnesota law, such an agreement is unenforceable where the agreement evidences nothing more than an intention to negotiate in the future.") (citing *Consolidated Grain & Barge Co. v. Madgett,* 928 F.2d 816, 817–18 (8th Cir.1991) (citation omitted)).

**14.** The October 6 letter contemplated an equity appreciation program with a total of seven par-

**B.**

Assuming *arguendo* that the October 6, 1988 letter is *not* too vague to be enforceable, we nonetheless conclude that the grants of summary judgment were properly entered below. In order to obtain a monetary recovery, the appellants were compelled by West Pac's initial poor performance to argue that the terms of the October 6 letter awarded them a perpetual right to share in West Pac's equity appreciation—regardless of their future employment status. This interpretation, however, flies in the face of the letter's language, and is contrary to common sense.

■ First, the letter plainly states: "Certain events could trigger the distribution of equity to participants. These include ... the termination of an employee who has a vested equity appreciation...." Both Schoffman and Keckeisen worked for West Pac for approximately two years before their respective terminations. Thus, under the letter's 25% per year vesting schedule, they were each entitled to roughly 50% of one seventh [14] of the value of West Pac's (enigmatically calculated) equity appreciation pool at that particular point in time. As it is undisputed that the value of West Pac's equity appreciation was zero at the time of Schoffman and Keckeisen's terminations, they were not entitled to receive anything.

To reach any other conclusion here would be unjustified. The letter mentions nothing about future or ongoing distributions—the letter references only "the distribution" to which each participant is entitled. Therefore, in order for a terminated employee to share in all future equity appreciations, Central States would have to estimate the total equity appreciation that West Pac would realize over the entire course of its existence; we decline to reach such an infeasible interpretation.

■ Second, Central States's argument comparing a perpetual share of equity appreciation to a property interest is well-taken. The right to share in the earnings of a venture—when such a right is segregated

ticipants.

from an incentive compensation scheme—is a classic attribute of ownership. *E.g.*, Harry G. Henn & John R. Alexander, Laws of Corporations 396 (1983). The terms of the October 6 letter, however, expressly disclaim an apportionment of ownership: "The capital necessary to start this new venture will come from Mr. Flowers and/or [Central States]. Accordingly, Mr. Flowers will own 100% of the venture directly or indirectly."

In sum, even if we were to reject the rationale employed by the district courts below, we would be constrained to uphold their results. In light of this conclusion, we need not address the other arguments raised by Central States. We have also considered the appellants' other arguments and found them to be without merit.

## IV. CONCLUSION

For the reasons set forth above, we AFFIRM the district courts' grant of Central States's motions for summary judgment.

AFFIRMED.